**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| THE SHELTERING ARMS CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 3:26-cv-975 |
| | ) | |
| HDR ARCHITECTURE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff The Sheltering Arms Corporation ("Sheltering Arms"), by counsel, states as follows for its Complaint against HDR Architecture, Inc. ("HDR").

### Parties and Jurisdiction

1. Plaintiff Sheltering Arms is a 501(c)(3) nonstock corporation organized under the laws of Virginia with its principal office located in Mechanicsville, Virginia.

2. Defendant HDR Architecture, Inc. is a stock corporation organized under the laws of Nebraska with its principal place of business located in Omaha, Nebraska.

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332. Plaintiff and Defendant are citizens of different states and the amount in controversy is in excess of $75,000.

4. Venue is proper pursuant to Local Rule 3(B)(4) because a substantial part of the events or omissions giving rise to the claim occurred in Goochland County, Virginia, which is located within this Richmond Division of this Court.

**Facts**

5. Sheltering Arms is engaged in the business of medical services, including building medical and rehabilitation facilities.

6. HDR is an architecture and engineering firm offering professional services in the construction field.

7. In 2018, Sheltering Arms began construction of the Sheltering Arms Institute, a large inpatient medical facility located at 2000 Wilkes Ridge Drive in Goochland County, Virginia.

8. In 2024, Sheltering Arms began fitting out the 4th floor space.

9. By contract dated March 7, 2024 (the "Agreement") (Exhibit 1), Sheltering Arms contracted with HDR to provide professional design services with respect to the fit-out of the building's fourth floor.

10. Sheltering Arms sought a design of the fourth floor substantially similar to the design of the third floor, but with two significant caveats: Sheltering Arms 1) wanted to incorporate the various redesigns implemented during the course of construction of the third floor and 2) wanted to incorporate certain design changes based on lessons learned from operating the hospital since 2020. Accordingly, Sheltering Arms wanted the fourth floor to mimic the third floor *as-built*, not as designed, and to incorporate other design changes.

11. HDR was well aware of the changes made during the course of construction of the third floor, as HDR had acted as the architect of record for construction of the whole building.

12. Prior to hiring HDR to provide fit-out services for the fourth floor, representatives of Sheltering Arms specifically discussed the changes that had been made to the third floor fit-out design during construction and asked HDR to be cognizant of those changes, as well as the changes related to lessons learned from operating the hospital since 2020.

13. When preparing to provide design services with respect to the fourth floor, representatives of HDR walked the third floor with representatives of Sheltering Arms and jointly noted the several changes that had been made during construction and several changes that Sheltering Arms wanted to make on the fourth floor related to lessons learned.

14. HDR had actual awareness that Sheltering Arms wanted the fourth floor to match the third floor as it had been built, not how it was shown on original drawings.

15. Sheltering Arms selected HDR as its architect for the fourth floor because Sheltering Arms knew that HDR was aware of the changes that had been made on the third floor.

16. When designing the fourth floor, HDR failed to take into account the various changes that had been made to the third floor, but rather utilized the third floor's original design when creating drawings and specifications for the fourth floor – the exact opposite of what Sheltering Arms had instructed.

17. During the course of construction, the contractor built the fourth floor in accordance with the drawings and specifications that HDR provided.

18. HDR failed to monitor the course of construction as it occurred. Had HDR acted with a reasonable level of professional diligence, it would have noticed the various errors occurring due to its faulty design as the construction progressed.

19. The errors that arose during construction were numerous. Some of the errors were so significant that it was clear that HDR had not even attempted to review its own work or monitor the construction.

20. For example, Sheltering Arms and the project team determined that countertops on the fourth floor were incorrectly designed and needed to be rebuilt.

21. Based upon the instruction to design the fourth floor in the same manner as the third floor had been built, there were numerous objectively obvious errors, including failing to design finishes consistent with the 3rd floor, light switches identified to be in the wrong place, doors in the wrong place, walls in different locations, cabinets to be installed at incorrect heights, horizontal bed bumpers specified instead of vertical bumpers to protect walls from the beds' up and down movements, and more.

22. Sheltering Arms paid its contractor to fix these various issues.

23. The bathroom doors designed by HDR did not allow for the doors to fully open and close due to the size of the door handle.

24. Sheltering Arms had to have its contractor procure custom fabricated door handles in order to make the doors functional and to reverse the installation of the expensive doors.

25. HDR's design included drywall being installed over a window, an error that would have been discovered by a cursory review of the HDR plans by HDR.

26. Sheltering Arms paid its contractor to remove the improperly designed drywall.

27. Ultimately, Sheltering Arms incurred external costs exceeding $200,000 to fix HDR's numerous design errors.

28. In addition to its external costs, Sheltering Arms incurred substantial internal costs, largely due to the substantial amount of time Sheltering Arms' employees had to spend overseeing remediation efforts.

29. Sheltering Arms also encountered an approximately 19-day delay in opening the fourth floor, leading to lost revenue and significant inconvenience for Sheltering Arms' staff and patients.

30. Sheltering Arms paid $634,187.00 for HDR's defective work.

31. Sheltering Arms reasonably estimates that its total damages are in excess of the total amount paid to HDR for its services.

**<u>Count I</u>**
**Breach of Contract**

32. Sheltering Arms incorporates the preceding paragraphs as if fully set forth herein.

33. As with any professional services contract, HDR agreed to perform its services in a manner consistent with the standards of the architecture industry, including using the level of professional skill and care ordinarily expected from a licensed architect.

34. HDR materially breached its Agreement with Sheltering Arms by failing to design the fourth floor in accordance with Sheltering Arms' clearly stated design requirements.

35. HDR materially breached its Agreement with Sheltering Arms by failing to act with a reasonable degree of professional diligence and otherwise failing to work in a manner consistent with the standards of the architecture profession.

36. HDR's specific material breaches include, but are not limited to:

a. Failing to review the as-built documents for the third floor;

b. Failing to include proper wheelchair clearance in the design;

c. Failing to design countertops in accordance with Sheltering Arms' requirements;

d. Failing to design doors, walls, and light switches in a manner consistent with the third floor;

e. Failing to design bathroom doors that properly functioned;

f. Failing to design windows and window sills in accordance with the third floor design;

g. Failing to design light fixtures in accordance with the third floor design;

h. Failing to include a fire wall that had been included in the third floor construction;

i. Failing to design electrical, phone, and data lines in a manner that properly aligned with the third floor lines.

37. HDR is liable to Sheltering Arms for all damages naturally flowing from HDR's breach of the Agreement, which includes, at a minimum, all costs to perform remedial construction work in order to correct HDR's design errors.

38. The damages Sheltering Arms suffered were a reasonably foreseeable result of HDR's material breaches of the Agreement.

39. As a direct and proximate result of HDR's material breaches of the Agreement, Sheltering Arms has suffered damages in excess of $634,187.00.

WHEREFORE, Sheltering Arms, by and through undersigned counsel, respectfully requests that this Court enter judgment against HDR in the amount of $634,187.00, or in such greater amount to be proven at trial, plus pre- and post-judgment interest at the legal rate, its reasonable attorneys' fees and costs, and to grant such further relief as the Court may deem just and proper.

Respectfully submitted,

/s/ Connor S. Bleakley
Courtney Moates Paulk (VSB No. 45523)
Connor S. Bleakley (VSB No. 92113)
Hirschler Fleischer, P.C.
2100 E. Cary Street
Richmond, Virginia 23223-7078
Telephone: (804) 771-9500
Facsimile: (804) 644-0957
E-mail: cpaulk@hirschlerlaw.com
cbleakley@hirschlerlaw.com
*Counsel for The Sheltering Arms Corporation*